**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA DORNSEIF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 C 4335 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiff Maria Dornseif ("Dornseif") brings this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of the final agency decision of the Commissioner of the Social Security

Administration ("Commissioner") denying her application for Title II Disability Insurance

Benefits ("DIB") pursuant to the Social Security Act, 42 U.S.C. §§ 416(i), 423(d) and

Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act, 42

U.S.C. §§ 1381a, 1382c.[1]  Before the Court is Dornseif's amended motion for summary

judgment asking the Court to reverse the Commissioner's decision and remand for an award of

benefits, or in the alternative, reverse and remand for further proceedings.  The Commissioner

also filed a motion for summary judgment seeking an order affirming the Commissioner's final

decision.  For the following reasons, the Court denies Dornseif's motion, grants the

Commissioner's motion, and dismisses this lawsuit in its entirety.

---

[1]  A claimant who cannot establish that she qualifies for DIB, namely, that she was
disabled while she was insured, may still receive SSI benefits if she can establish that she is
disabled and has limited means.  *See Liskowitz v. Astrue,* 559 F.3d 736, 740 n.2 (7th Cir. 2009);
*Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005).

## PROCEDURAL HISTORY

On February 12, 2007, Dornseif applied for DIB and SSI alleging that she became disabled beginning on January 1, 2006 based on her seizure disorder. On September 12, 2007, Dornseif's application was initially denied and on July 1, 2008 Dornseif's application was denied upon reconsideration. On July 29, 2008, Dornseif filed a written request for a hearing and on October 21, 2009, Dornseif appeared and testified before Administrative Law Judge ("ALJ") Karen Sayon in Orland Park, Illinois. Dornseif's mother, Maria Aleman, and Grace Gianforte, an impartial vocational expert, also testified at the October 2009 hearing. On November 18, 2009, the ALJ concluded that Dornseif was not disabled within the meaning of the Social Security Act. Thereafter, Dornseif requested a review of the ALJ's decision with the Social Security Administration's Appeals Council and on May 18, 2011, the Appeals Council denied the request for review. Dornseif filed the present action for judicial review on June 25, 2011.

## FACTUAL BACKGROUND

### I.      Vocational Evidence

Dornseif was born on October 6, 1955 and was 54 years old on the date of the ALJ's November 18, 2009 decision. (R. 20, Admin. Record, at 22.) Dornseif has a high school education and had worked as a part-time presser at a dry cleaners for approximately ten years prior to the ALJ's decision – working four hours a day without a break, six days a week. (*Id.* at 462-64, 478.) Dornseif is 5'6" tall and weighs 195 pounds. (*Id*. at 463.)

## II.     Medical Evidence

Medical evidence in the record includes information from Dornseif's physician, Dr. Dinesh K. Jain, M.D., who prescribed Dilantin for Dornseif's seizure disorder.  Dr. Jain saw Dornseif on a regular basis from approximately 2001 until at least 2009.  On May 4, 2009, for example, Dr. Jain noted that the Dilantin controlled Dornseif's seizure disorders and that she had had her last seizure approximately four years earlier.  (*Id.* at 426.)  Dr. Jain also saw Dornseif on September 19, 2008, at which time Dornseif explained that she had stopped drinking alcohol the year before.  (*Id*. at 427.)  In May or June of 2007, Dornseif reported to Dr. Jain that her last seizure was approximately two years earlier.  (*Id*. at 428.)  At that time, Dornseif also reported that she was still drinking alcohol on and off and Dr. Jain observed that she was "very non-compliant."  (*Id*.)  He also recommended that she should stop consuming alcohol.  (*Id*.)  On February 24, 2004, Dr. Jain noted that Dornseif was not compliant with taking her Dilantin and that her last seizure was in 1989.  (*Id.* at 237.)  In fact, as early as March 8, 2001, Dr. Jain noted that Dornseif was not compliant with taking her Dilantin.  (*Id.* at 239.)  Meanwhile, in July 2002, Dr. Jain recommended that Dornseif should not operate dangerous machinery or be exposed to hazardous materials due to her seizure disorder.  (*Id*. at 238.)

Other medical evidence in the record includes discharge information from Dornseif's emergency room visit to St. James hospital in Olympia Fields, Illinois, in May 2007, at which time she was treated for Dilantin toxicity.  (*Id*. at 248, 256-57.)  Doctors at St. James also prescribed Xanax for her insomnia and anxiety disorder.  (*Id*. at 258.)  Dornseif's St. James medical records also indicate that she had a petit mal seizure sometime in 2004.  (*Id*. at 259.)  Dornseif returned to St. James on May 15, 2007 with flushed skin and complaints of her throat

closing up. (*Id.* at 292-93.) After doctors diagnosed Dornseif's symptoms as an allergic reaction, they proscribed Benadryl. (*Id.* at 293.)

After Dornseif originally applied for disability benefits, Dr. Ronald Havens, PhD, on behalf of the state agency, performed a Psychiatric Review Technique of Dornseif on September 6, 2007. (*Id.* at 433.) Dr. Havens concluded that Dornseif had depression and alcohol abuse in remission, but that these impairments were not severe. (*Id.*) He also concluded that Dornseif had no functional limitations and that her impairments did not interfere with her social interactions, cognitive capacities, or activities of daily living. (*Id.* at 433, 445.)

On September 7, 2007, a state agency medical consultant, Dr. Marion Panepinto, M.D., provided his medical opinion as to Dornseif's physical residual functional capacity ("RFC"). (*Id.* at 447.) Dr. Panepinto's report indicates that Dornseif has seizure disorder. (*Id.*) In his report, he found that Dornseif could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds. (*Id.* at 448.) Dr. Panepinto also found that Dornseif could stand or walk for a total of about 6 hours a day in an eight hour work day and sit with normal breaks for about 6 hours in an eight hour work day. (*Id.*) Moreover, Dr. Panepinto concluded that Dornseif's ability to push and/or pull was unlimited. (*Id.*)

On January 19, 2008, Dornseif went the emergency room at St. James Hospital because she had slipped on ice and dislocated her left knee. (*Id.* at 337-38.) The St. James' medical records reveal that Dornseif drank three or four glasses of wine that day before she slipped and fell. (*Id.* at 341.) That same day, doctors performed popliteal bypass surgery on her left leg. (*Id.* at 337-38.) On January 27, 2008, the hospital transferred Dornseif to a skilled nursing facility for rehabilitation. (*Id.* at 337.)

In February 2008, Dr. Matthew Johnson, Dornseif's attending physician during her hospitalization, reported in a letter addressed "to whom it may concern" that Dornseif had a severe debilitating illness that prevented her from standing for prolonged periods of time. (*Id.* at 425.) Also in February 2008, Dr. Savio Manatt, M.D., conducted a physical examination noting that Dornseif was overweight and had anxiety problems. (*Id.* at 404.)

At a consultative examination on June 7, 2008 – approximately five months after Dornseif's surgery – Dr. Albert Osei, M.D., examined Dornseif at the request of the state agency. (*Id.* at 406-09.) Dr. Osei reported that Dornseif has a history of seizure disorder with recurrent episodes, a history of left knee joint dislocation, elevated blood pressure, and history of left popliteal bypass with normal peripheral pulses. (*Id.* at 408.) In his report, Dr. Osei observed that Dornseif "was able to get on and off the exam table with no difficulty, [and] could walk greater than 50 feet without support." (*Id.* at 407.) Also, Dr. Osei reported that Dornseif herself stated that she could walk about 100 feet. (*Id.* at 406.) He further observed that her "gait was non-antalgic without the use of assistive devices." (*Id.*) In addition, he reported that Dornseif "was unable to perform toe/tandem walk, but was able to do tandem walk, [but] squatting was incomplete and she could stand on either leg but [was] unable to hop." (*Id.*) Dr. Osei observed that Dornseif wore a brace on her left leg and that her left hip had a limited range of motion, although her left knee joint had a full range of motion. (*Id.*) Moreover, Dr. Osei noted that Dornseif's range of motion for her cervical spine, lumbar spine, and right limb joints were all normal. (*Id.* at 407.)

On June 26, 2008, Dr. Charles Wabner, M.D., performed a RFC assessment on behalf of the state agency. (*Id.* at 413.) Dr. Wabner's report indicates that Dornseif has seizure disorder,

vascular insufficiency, and hypertension. (*Id.*) He found that Dornseif could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. (*Id*. at 414.) Also, Dr. Wabner found that Dornseif could stand or walk for a total of about 6 hours a day in an eight hour work day and sit with normal breaks for about 6 hours in an eight hour work day. (*Id.*) Dr. Wabner further concluded that Dornseif's ability to push and/or pull was unlimited, but that her history of popliteal bypass and knee pain limited her to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (*Id*. at 414-15.)

## III.  Hearing Testimony

### A.  Maria Dornseif's Testimony

Dornseif testified at the October 21, 2009 hearing that she lived with her mother at her mother's house, that no minor children lived at the house, and that she does not have a driver's license because of her seizures. (*Id.* at 462.) Further, Dornseif testified that prior to hurting her knee in 2008, she worked part-time as a presser at a dry cleaners because of her seizure disorder and that she had never worked full-time. (*Id.* at 464.) She also testified that when she works on the automatic presser, she is always on her feet. (*Id*. at 464-65, 486.) Dornseif then explained that since her knee surgery she feels like she has ants crawling all over her leg and that she takes Tylenol and aspirin for pain. (*Id.* at 465-66.)

Next, Dornseif discussed her seizure disorder explaining that it comes on when she is under a lot of pressure. (*Id.*) She stated that sometimes she'll have seizures three times a week and that sometimes she has them once every two weeks. (*Id.*) She recalled that she had a seizure a few months prior to the October 2009 hearing. (*Id.*) Dornseif explained that during her seizures she becomes very rigid and her head pulls back. (*Id*. at 467.) Also, she testified that

during or after a seizure, she will often get a shot of Benadryl, after which she falls asleep. (*Id.*) She explained that if her seizures are really bad, her mother will call the paramedics and that within the last year the paramedics had come to her house at least five times. (*Id.*)

Further, Dornseif testified that she is compliant with her medication, Dilantin, and that she does not drink, although she admitted to having a drink on New Year's Eve. (*Id.* at 467-68.) The ALJ, however, told Dornseif that she reviewed Dornseif's medical records and that Dornseif had admitted to occasional alcohol in December 2007, that her doctor reported that she was drinking on and off and not compliant with her medication in May 2007, and that medical records revealed that Dornseif had three or four glasses of wine the day she fell and hurt her knee in January 2008. (*Id.* at 468.) In response, Dornseif stated: "I can't drink and if I did drink I don't remember." (*Id.*) The ALJ also noted that Dornseif had just testified at the hearing that she had seizures all the time, but that her doctor's note of May 2009 stated that her last seizure was four years prior to that date. (*Id.*) Dornseif then testified that the doctor's note was wrong. (*Id.*)

In addition, Dornseif testified that she cannot work full-time because she cannot stand for long periods of time, although she stands for four hours straight as a presser because she knows she can then go home and lie down. (*Id.* at 468-69.) Dornseif testified that she does not have problems sitting nor does she have problems lifting or carrying. (*Id.* at 469.) Furthermore, Dornseif stated that on a normal day she goes to work, comes home, takes a nap, cleans the house, and helps her mother. (*Id.* at 469-70.) Dornseif explained that she goes with her mother grocery shopping and takes her to the doctor because her mother has a heart condition. (*Id.* at 470.) She also testified that she cooks, does laundry, and reads the Bible. (*Id.*)

When her attorney questioned her, Dornseif clarified that she limits herself to four hours a day at work because when she is under pressure or exhausted she has seizures.  (*Id.* at 471.)  She also testified that she could not work an eight hour shift due to exhaustion.  (*Id.*)  Dornseif also elucidated that she takes a nap for an hour and then helps around the house or grocery shops, but that she does not do each chore every day.  (*Id.* at 471-72.)  She also explained that each task she described takes an hour or an hour and a half to do.  (*Id.* at 472.)  Dornseif further testified that she prepares food, which does not take more than 15 minutes a meal.  (*Id.* at 473-74.)  In addition, Dornseif testified that she no longer wears a brace on her left leg, but instead wears an ace bandage.  (*Id.* at 477.)

Moreover, Dornseif testified that she takes Dilantin for her seizures and that at one point she took Zoloft for anxiety.  (*Id.* at 474.)  She said that the Dilantin gives her a stomach ache and also causes dizziness and fatigue.  (*Id.* at 469, 474-75.)  Furthermore, Dornseif testified that she was hospitalized in 2007 due to Dilantin poisoning, namely, that she took too much.  (*Id.* at 474.)  Dornseif then explained her seizures stating that she has black outs at night about three times a week and that they are not grand mal seizures.  (*Id.* at 475.)  She also stated that Dilantin causes hallucinations and that sometimes she sees bugs on the wall or that she feels like someone is standing behind her.  (*Id.* at 478.)

### B.     Maria Aleman's Testimony

Dornseif's mother, Maria Aleman, also testified at the October 2009 hearing.  Aleman explained that she has witnessed Dornseif's seizures and that Dornseif had a seizure about eight months prior to the October 2009 hearing.  (*Id.* at 480.)  Aleman also stated that Dornseif hallucinates a lot and sometimes does not act like herself.  (*Id.*)  In addition, Aleman testified

that Dornseif drinks alcohol when she goes out for occasions, such as her birthday.  (*Id*. at 481.)

Aleman then explained that sometimes her daughter does not take her medication which results

in Dornseif not acting like herself.  (*Id*. at 482-83.)  Finally, Aleman stated that sometimes

Dornseif takes too much medication when she is stressed out at work.  (*Id*. at 484.)

C.    **Grace Gianforte's Testimony**

Grace Ginaforte, an impartial vocational expert, also testified at the October 2009 hearing

explaining that Dornseif's past work has been that of automatic presser, DOT Code 363.685-

0124.  (*Id*. at 487.)  Ginaforte clarified that the U.S. Department of Labor Dictionary for

Occupational Titles identifies the job of automatic presser as light and with a Specific Vocational

Preparation ("SVP") of 3.  (*Id*. at 487.)  The ALJ then posed a hypothetical question to Gianforte

in which the individual is 54 years old, a high school graduate, and has the same work history as

Dornseif.  (*Id*.)  The hypothetical also assumed that the individual is limited to light work –

meaning work that involves lifting and carrying up to 20 pounds occasionally, 10 pounds

frequently, and standing or walking about six hours in an eight hour work day.  (*Id*. at 487-88.)

The other limitations the ALJ included in the hypothetical included no concentrated exposure to

hazards or dangerous machinery and some postural limitations, namely, only occasional

climbing, balancing, stooping, kneeling, crouching, and crawling.  (*Id*. at 488.)

In response, Gianforte testified that such a person could work light jobs, including hand-

presser (approximately 1,200 jobs), coin operated laundry attendant (approximately 1,500 jobs),

and self service store attendant (approximately 3,000 jobs).  (*Id*. at 488-89.)  Gianforte also

testified that there are some medium jobs with the same limitations, including steam pressing

machine operator (approximately 1,200 jobs), automatic presser (approximately 1,200 jobs), and

kitchen helper (approximately 3,000 jobs).  (*Id*. at 489.)

## ALJ's DECISION

The ALJ evaluated Dornseif's application under the five-step sequential analysis, and at step one, found that Dornseif had not engaged in substantial gainful activity since January 1, 2006, which was the alleged onset date.  (*Id*. at 14.)  At step two, the ALJ concluded that Dornseif had the following severe impairments: (1) seizure disorder; (2) history of left knee dislocation; and (3) vascular insufficiency with status post bypass surgery.  (*Id.* at 15.)  At step three, the ALJ determined that Dornseif did not have an impairment or a combination of impairments that met or medically equaled one of the list impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id*. at 16.)  The ALJ then proceeded to consider Dornseif's RFC concluding that Dornseif had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), but that Dornseif is limited to work that involves only occasional climbing, kneeling, balancing, stooping, crawling, and crouching.  (*Id*. at 16-17.)  Also, the ALJ determined that Dornseif should avoid concentrated exposure to hazards and dangerous machinery.  (*Id*. at 17.)  At step four, the ALJ determined that Dornseif had no past relevant work experience, and at step five, the ALJ concluded that there are jobs that exist in significant numbers in the national economy which Dornseif can perform.  (*Id*. at 22-23)  Accordingly, the ALJ determined that Dornseif was not disabled under the Social Security Act.  (*Id*. at 23.)

## LEGAL STANDARDS

### I.      Standard of Review

"Courts have the statutory power to affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings."  *Allord*

*v. Astrue,* 631 F.3d 411, 415 (7th Cir. 2011).  Because the Appeals Council denied Dornseif's

request for review, the Court reviews the ALJ's decision as the Commissioner's final decision.

*See id.; Schaaf v. Astrue,* 602 F.3d 869, 874 (7th Cir. 2010).  The Court will uphold the

Commissioner's decision if the ALJ applied the correct legal standards and substantial evidence

supports the decision.  *See Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011); *Campbell v.

Astrue,* 627 F.3d 299, 306 (7th Cir. 2010).  "When reviewing for substantial evidence, [courts]

do not displace the ALJ's judgment by reconsidering facts or evidence or making credibility

determinations."  *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010) (citation omitted).

## II.    Disability Standard

A person is disabled for purposes of DIB and SSI if there is an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also

Weatherbee v. Astrue,* 649 F.3d 565, 568 (7th Cir. 2011).  Also, to qualify for DIB "a claimant

must show that the disability arose while he or she was insured for benefits."  *Liskowitz v.

Astrue,* 559 F.3d 736, 740 (7th Cir. 2009); *also Allord,* 631 F.3d at 416.  To qualify for SSI, a

claimant must establish that she has limited means as defined by 42 U.S.C. § 1382(a).  *See

Liskowitz*, 559 F.3d at 740 n.2.

In determining whether a claimant is disabled under Section 423(d)(1)(A), the

Commissioner created a five-step, sequential analysis under 20 C.F.R. § 404.1520.  *See Castille,*

617 F.3d 926-27; *Larson v. Astrue,* 615 F.3d 744, 748 (7th Cir. 2010).  Under this five-step

analysis, a claimant must show that:  (1) she is not presently engaged in substantial gainful

activity; (2) her impairment is severe; and (3) her impairment meets or is equal to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). If the impairment meets or equals one of the listed impairments in step three, the claimant qualifies for disability benefits and the ALJ need not make any further inquiries. *See Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). If the claimant does not qualify for benefits under step three, the ALJ's analysis proceeds to step four, which requires an assessment of whether the claimant has insufficient residual functional capacity ("RFC") to perform her past relevant work. *See Simila v. Astrue,* 573 F.3d 503, 513 (7th Cir. 2009). If the impairment precludes performance of past work, under step five, the ALJ considers the claimant's age, education, past relevant work experience, and RFC to determine if other work exists in significant quantity in the national economy that would accommodate the claimant. *See Craft,* 539 F.3d at 674. The claimant bears the burden of proof through step four of this sequential analysis. *See Weatherbee,* 649 F.3d at 569. At step five, the burden shifts to the Commissioner to establish that the claimant can successfully perform a significant number of jobs existing in the national economy. *See id.*

## ANALYSIS

In her summary judgment motion, Dornseif argues that: (1) the ALJ made a critical factual error that was not based on substantial evidence in the record; (2) the ALJ improperly rejected her treating physician's opinion; (3) the ALJ improperly analyzed her credibility; (4) the ALJ improperly analyzed the effects of her obesity; (5) the ALJ's failure to obtain a medical source statement violated her rights to due process and equal protection of the laws under the United States Constitution; (6) the ALJ failed to consider the entire record; and (7) the ALJ

relied on exhibits that were not admitted into evidence.  The Court addresses each argument in turn.

## I.     Substantial Evidence

Dornseif first argues that the ALJ made a critical factual error establishing that the decision was not based on substantial evidence.  *See Jelinek,* 662 F.3d at 811 ("a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence").  As the Seventh Circuit teaches, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010).

Dornseif specifically highlights the ALJ's summary of Dr. Osei's June 7, 2008 consultative physical examination as factually erroneous in which the ALJ concluded that "[t]he claimant's physical examination was *essentially* normal and unremarkable (Exhibit 8F)." (Admin. Record. at 18-19.) (emphasis added).  Dornseif argues that the ALJ's conclusion is unsupported because her examination was not normal or unremarkable due to Dr. Osei's observations that she could not perform toe/tandem walking, was unable to squat completely, could not hop, had a reduce range in motion in her left hip, and wore a leg brace.  Dr. Osei, however, also reported that Dornseif was able to tandem walk, get on and off the examination table with no difficulty, and could walk greater than 50 feet without support.  Also, Dr. Osei reported that Dornseif herself stated that she could walk about 100 feet.  He further explained that although her left hip had a limited range of motion, her left knee joint had a full range of motion.  In addition, Dr. Osei noted that Dornseif's range of motion for her cervical spine,

lumbar spine, and right limb joints were all normal. As such, the ALJ's conclusion that

Dornseif's June 2008 physical examination was *essentially* normal has an adequate foundation in

the record, and thus is supported by substantial evidence. *See Scott v. Astrue,* 647 F.3d 734, 739

(7th Cir. 2011) ("Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'") (citation omitted).

## II.     Treating Physician's Opinion

Next, Dornseif argues that the ALJ improperly rejected her treating physician's opinion.

A "treating physician's opinion that is consistent with the record is generally entitled to

'controlling weight.'" *Jelinek,* 662 F.3d at 811 (citing 20 C.F.R. § 404.1527(d)(2)). In

particular, a "treating doctor's opinion receives controlling weight if it is 'well-supported' and

'not inconsistent with the other substantial evidence' in the record." *Scott,* 647 F.3d at 739

(citation omitted). If an ALJ rejects a treating physician's opinion, she must provide a sound

explanation for any such rejection. *See Jelinek,* 662 F.3d at 811; *see also Scott,* 647 F.3d at 739

("An ALJ must offer 'good reasons' for discounting the opinion of a treating physician").

As discussed above, in February 2008, Dr. Matthew Johnson, Dornseif's attending

physician during her hospitalization after her knee surgery, reported in a letter addressed "to

whom it may concern" that Dornseif had a severe debilitating illness that prevented her from

standing for prolonged periods of time. In addressing Dr. Johnson's opinion, the ALJ stated that

"this opinion was rendered just shortly after the claimant injured her left knee, and .... based

upon her testimony and medical records there is no evidence that she has ongoing problems."

(Admin. Record at 19.) The ALJ further clarified "that the claimant has no treatment records

with Dr. Johnson beyond her January 2008 hospitalization." (*Id.*) As such, the ALJ found that

"Dr. Johnson's opinion is limited in scope to the period during which the claimant injured her knee and received treatment and is no longer applicable to the claimant's condition as the opinion is inconsistent with the evidence of record, including the claimant's testimony that she stands for 3 to 4 hours per day at work."  (*Id*. at 19-20.)

In sum, the ALJ gave a sound explanation for why she rejected Dr. Johnson's opinion, including that it was dated, limited in scope, and not well-supported.  *See Jelinek,* 662 F.3d at 811.  Indeed, there were no other treatment records by Dr. Johnson except his short February 2008 letter.  In addition, Dr. Johnson's cursory letter did not indicate how long Dornseif's restriction would last and what he meant when he referred to her "severe debilitating illness." The ALJ also found that Dr. Johnson's statement was inconsistent with other substantial evidence, namely, Dornseif's own testimony that she stands for three to four hours at a time while working at the dry cleaners.  *See Scott,* 647 F.3d at 739.  For these reasons, the ALJ's rejection of Dr. Johnson's brief, unsupported opinion was not improper.

## III.     Credibility Determinations

Dornseif also maintains that the ALJ improperly analyzed her credibility regarding her symptoms and pain.  As the Seventh Circuit instructs, the "ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying."  *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010).  "Rather than nitpick the ALJ's opinion for inconsistencies or contradictions," courts give the ALJ's credibilitiy determinations a "commonsensical reading."  *Id*.

Here, Dornseif specifically argues that the ALJ improperly considered her failure to pursue additional testing and treatment.  In this context, Dornseif argues that the ALJ ignored her

doctor's statement the he can do no more than to give her Dilantin and her mother's testimony

that Dornseif sometimes lacks money.  First, the ALJ commented that Dornseif did not seek any

additional testing or treatment in the context of her knee injury, not her seizure disorder, when

discussing that Dornseif had no ongoing problems regarding her knee injury.  (Admin. Record, at

19; *see also* Hr'g Tr. at 492.)   Second, Dornseif's argument takes her own hearing testimony

and Dr. Jain's comments out of context.  As the record reflects, Dr. Jain repeatedly noted that

Dilantin controlled Dornseif's seizure disorders.  Dornseif's hearing testimony that "there was

nothing else he can give me" does not change the fact that the Dilantin worked.

Moreover, the ALJ extensively cited factors in the record that contradicted Dornseif's

own testimony regarding her physical condition, including the many discrepancies regarding the

frequency of her seizures.  (Admin. Record, at 16-22.)  Because the ALJ thoroughly explained

her credibility determinations and supported her determinations with substantial evidence,

Dornseif's credibility argument fails.  *See McKinzey v. Astrue,* 641 F.3d 884, 890 (7th Cir. 2011)

("As long as the ALJ has explained her decision," courts "'will not overturn an ALJ's credibility

determination unless it is 'patently wrong.'") (citation omitted).

## IV.      Effects of Obesity

Next, Dornseif contends that the ALJ did not properly evaluate the effects of her obesity

in accordance with Social Security Ruling ("SSR") 02-1p.  Pursuant to SSR 02–1p, "an ALJ

should consider the effects of obesity together with the underlying impairments, even if the

individual does not claim obesity as an impairment."  *Prochaska v. Barnhart,* 454 F.3d 731, 736

(7th Cir. 2006).  A "failure to consider the effect of obesity is subject to harmless-error analysis."

*Villano v. Astrue,* 556 F.3d 558, 562-63 (7th Cir. 2009).

Dornseif is 5'6" tall and weighs 195 pounds, and thus has a Body Mass Index ("BMI") of 31.5, which falls slightly above Level 1 obesity. *See Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004). To clarify, an individual with a BMI of 30 is considered obese, whereas an individual BMI of 40 or greater is considered morbidly obese. *See Martinez v. Astrue,* 630 F.3d 693, 698 (7th Cir. 2011). Dornseif has been marginally obese since at least July 2002 – as medical evidence in the record shows that Dornseif has consistently weighed between 191-213 pounds from July 2002 until May 2009. (Admin. Record at 235-39, 404, 426-28, 454.)

In her Social Security filings, however, Dornseif never mentions her obesity until the present federal lawsuit for judicial review. "Where the claimant herself is silent in this regard, we have repeatedly excused as harmless error the failure of an ALJ to explicitly address the claimant's obesity as SSR 02-1p prescribes so long as the ALJ demonstrated that he reviewed the medical reports of the doctors familiar with the claimant's obesity." *Hernandez v. Astrue,* 277 Fed.Appx. 617, 624, 2008 WL 2025088, at *5 (7th Cir. 2008). In other words, when an ALJ relies upon the opinions of doctors who were aware of a claimant's obesity, the impact of obesity is "factored indirectly into the ALJ's decision as part of the doctors' opinions." *Prochaska,* 454 F.3d at 737; *see also Skarbek,* 390 F.3d at 504.

Although the ALJ did not explicitly address Dornseif's obesity, the ALJ predicated her decisions on Dr. Jain's multiple examinations in which he repeatedly noted Dornseif's height and weight, Dr. Manatt's February 2008 physical examination in which he observed that Dornseif was overweight, Dr. Panepinto's September 7, 2007 RFC assessment noting Dornseif's height and weight, and Dr. Osei's June 7, 2008 report that Dornseif was "well built and nourished" and weighed 200 pounds. *See Prochaska,* 454 F.3d at 737. Also, there are no

medical opinions in the record that identify Dornseif's obesity as aggravating either her seizure disorder or her 2008 knee injury. *See id.* In fact, Dornseif fails to point to any evidence or explain how her obesity exacerbated her ability to work. *See Skarbeck,* 390 F.3d at 504; *see also Hisle v. Astrue,* 258 Fed.Appx. 33, 37, 2007 WL 4439843, at *4 (7th Cir. Dec. 19, 2007) ("claimant must articulate how her obesity limits her functioning and exacerbates her impairments"). Under similar circumstances, the Seventh Circuit has concluded that the ALJ's failure to explicitly consider the effects of obesity was harmless error. *See Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504. Therefore, the ALJ's failure to explicitly consider Dornseif's obesity was harmless error.

## V.     Due Process and Equal Protection

Next, Dornseif argues that the Commissioner's failure to obtain a medical source statement ("MSS") from the consultative medical examiner violated her rights to due process and equal protection of the laws under the United States Constitution. According to 20 CFR § 404.1519n(c)(6), however, the lack of a MSS does not necessarily render a consultative examination incomplete. *See also* 20 CFR § 416.919n(c)(6). Thus, the absence of a MSS, alone, cannot form the basis for a equal protection or due process claim as Dornseif argues. *See Dragisic v. Astrue,* No. 11 C 0999, 2012 WL 893728, at *11 n.9 (N.D. Ill. Mar. 15, 2012); *see also Davidson v. Astrue,* No. 00-cv-2090-bbc, 2008 WL 4865584, at *14 (W.D. Wis. Nov. 6, 2008) ("a medical source statement regarding the claimant's functional capacity is not necessary to a disability determination"); *Eaton v. Astrue*, 3:07-CV-382 CAN, 2008 WL 2477580, at *7 n.5 (N.D. Ind. June 16, 2008) (under 20 CFR § 404.1519n(c)(6), "the ALJ had discretion to seek an RFC or MSS").

Moreover, Dornseif supports her due process and equal protection claims by relying on an Arizona Disability Determination Services consultative examination report dated November 15, 2007 and an Arizona Disability Determination medical source statement dated September 2, 2009 to support her argument. (R. 21-1, Pl.'s Ex. A.) Dornseif, however, never presented these reports to the ALJ for review and federal courts can only consider evidence that was before the ALJ – with the limited exception of evidence that is new and material – which is not the case here. *See Simila,* 573 F.3d at 522; *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir. 1994). Therefore, Dornseif's due process and equal protection claims fail on this basis as well.

**VI.    Entire Record**

Dornseif also maintains that the ALJ did not consider the entire record in denying her disability benefits. *See Arnold v. Barnhart,* 473 F.3d 816, 822 (7th Cir. 2007) (ALJ must "consider all of the evidence in the case record, including any statements by the individual and other persons concerning the claimant's symptoms"). As the Seventh Circuit teaches, however, an "ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *See O'Connor-Spinner,* 627 F.3d at 618. In addition, an ALJ must only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008) (citation omitted).

In this case, the ALJ thoroughly examined and specifically relied upon relevant medical and non-medical evidence in the record, including Dornseif's July 2, 2007 work history report, her DIB insured status report dated June 1, 2009, her attorney's undated memorandum concerning Dornseif's alleged impairments, the medical records concerning Dornseif's Dilantin

toxicity incident, the state agency's psychological consultants' reports and assessments, the state agency's RFC assessments, Dr. Manatt's February 2008 examination, Dr. Osei's June 7, 2008 consultative examination, Dr. Jain's numerous treatment notes, Dornseif's SSA-3368 disability report, Dornseif's SSA-3441 disability report, various hospital records from St. James Hospital in Olympia Fields, Illinois, the nursing rehabilitation facility's January 2008 to February 2008 medical records, Dr. Johnson's February 2008 letter, family members' seizure questionnaires, a State of Illinois Driver's License medical report, and the hearing testimony. (Admin. Record, at 14-22, 457-494.)

In examining this evidence, the ALJ determined that Dornseif's seizure disorder is well controlled by Dilantin, that Dornseif's knee injury and vascular insufficiency have significantly improved, and that the surgery successfully relieved her leg/knee symptoms. In addition, the ALJ concluded Dornseif's daily activities not only include working four hours a day, but that she performs many chores and tasks at home. *See Berger,* 516 F.3d at (fact that claimant could "perform some work cuts against his claim that he was totally disabled"). The ALJ also concluded that Dornseif successfully treats her pain with over-the-counter medications. By articulating her justifications for rejecting and accepting certain evidence, the ALJ built a logical bridge from the evidence to her conclusions, including that Dornseif had a RFC to perform medium work and that she could stand for six hours in an eight hour work day. *See Berger,* 516 F.3d at 545; *see also Simila,* 573 F.3d at 513-14 (even if reasonable minds could differ regarding whether claimant is disabled, courts will affirm ALJ's decision if it has adequate support).

In addition to Dornseif's arguments that the Court has already discussed, she also contends that the ALJ failed to take into consideration her testimony that she cannot stand long

20

enough to work full-time, including her testimony that she must go home and nap for an hour after working for four hours and that she cannot be on her feet six hours out of eight. Dornseif also argues that the ALJ failed to consider the vocational expert's favorable answers that she gave on cross-examination, including that if a person were limited to standing and/or walking 3 to 4 hours in a workday, that person would be limited to sedentary work.

These hypothetical limitations, however, were based on Dornseif's testimony regarding her own assessment of her capabilities and not the controlling RFC findings. And, as discussed, the ALJ determined that Dornseif's testimony was not fully credible. Therefore, the ALJ was not required to give credit to the more restrictive hypothetical questions based on Dornseif's own testimony, especially in light of the ALJ's thorough examination of the medical and non-medical evidence in the record. *See Kadelak v. Astrue,* 802 F.Supp.2d 934, 946 (N.D. Ill. 2011); *see also Jones,* 623 F.3d at 1162 (7th Cir. 2010) (an ALJ "is prohibited only from ignoring an entire line of evidence that supports a finding of disability"). Therefore, Dornseif's argument that the ALJ did not consider the entire record fails.

## VII.    Exhibits Not in Evidence

Last, Dornseif argues that the ALJ's finding that she has a RFC for medium work is unsupported by the record because the ALJ did not admit the exhibits she relied upon in making this determination – Exhibits 13F through 17F – into the record at the October 2009 hearing. These exhibits, however, were made part of the record before the ALJ issued her decision in November 2009. (Admin. Record, at 28.) *See McClesky v. Astrue,* 606 F.3d 351, 354 (7th Cir. 2010) ("evidence can be submitted up to the date an ALJ decision is issued"). In fact, an ALJ has broad discretion to admit records into evidence after the close of the hearing, which the ALJ

did in this case. *See Hamilton v. Astrue,* No. 4:07-cv-0177-DFH-WGH, 2008 WL 2705171, at

*7 (S.D. Ind. June 24, 2008) (Hamilton, J.). Accordingly, Dornseif's final argument lacks merit.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion for summary judgment,

grants Defendant's motion for summary judgment, and dismisses this lawsuit in its entirety.

**Dated:** April 26, 2012

ENTERED

AMY J. ST. EVE
United States District Court Judge